[No. B035809. Second Dist., Div. Six. Aug. 7, 1989.]

RAYTHEON COMPANY, Petitioner and Appellant, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant
and Respondent;
Estate of JOHN E. CHADBOURNE, Real Party in Interest and
Respondent.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions directed to be published follow.

1244

## COUNSEL

Alfred C. Phillips and Michael L. Halperin for Petitioner and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Carole Ritts Kornblum, Assistant Attorney General, Marian M. Johnston and Louis Verdugo, Jr., Deputy Attorneys General, for Defendant and Respondent.

Catherine I. Hanson, Astrid G. Meghrigian, Alice P. Mead, Jon W. Davidson, Paul L. Hoffman, Roger Tansey, Matthew A. Coles, Margaret C. Crosby, Alan L. Schlosser, Edward M. Chen, and Betty Wheeler as Amici Curiae on behalf of Defendant and Respondent.

Chris Redburn, Robert Barnes, Leroy S. Walker, Peter F. Laura, Elizabeth Baker, Leonard Graff, Farella, Braun & Martel and Douglas R. Young for Real Party in Interest and Respondent.

OPINION

**ABBE, J.**—May an employer discharge an employee solely because he has been diagnosed as having Acquired Immune Deficiency Syndrome (AIDS)? No.

Raytheon Company (Raytheon) maintains a facility in Goleta, California, where it produces electromagnetic systems pursuant to contracts with the United States Government. Raytheon hired John Chadbourne (Chadbourne) on February 4, 1980, on a permanent basis and soon made him responsible for investigating causes of product failures and recommending corrective actions. Chadbourne's duties were primarily clerical and his responsibilities required that he meet with various individuals throughout the plant to discuss his findings and recommendations. While at Raytheon, Chadbourne's job performance reviews were uniformly high and he received the maximum possible pay increases. Raytheon has never contended that there were any deficiencies in Chadbourne's work performance.

In early December 1983, Chadbourne became ill and entered a hospital. He was diagnosed by Doctors Steven Hosea and Andrew Binder as having pneumocystis carinii pneumonia and AIDS. Doctor Hosea is an infectious disease expert and was Chadbourne's treating physician. Chadbourne was discharged from the hospital in early January 1984, in the care of Doctor Hosea. He died one year later at age 35 of complications of AIDS.

When Chadbourne left the hospital, he was released by Doctor Hosea to return to work. Doctor Hosea wrote: "John [Chadbourne] has been recuperating at home for the last two weeks and is doing well. He may return to work. Of note is that there have been no cases of Acquired Immunity Deficiency Syndrome in close contacts of patients with AIDS. It seems like this disease can only be transmitted by blood transfusions, sharing of intravenous needles or sexual contact."

On January 20, Chadbourne, who was able and anxious to return to work, took a physical examination required by Raytheon of all employees who had been absent from work for health reasons for more than 10 days. The physical examination was performed by Patricia Hebyl, the occupational nurse at the plant and Alexander Donald, a physician who acted as Raytheon's medical consultant at that facility. Both Nurse Hebyl and Doctor Donald obtained the information from Chadbourne and from his physician that Chadbourne had AIDS.

Doctor Donald practices occupational medicine and family medicine. He is not an expert in infectious diseases, epidemiology, or public health. In a

telephone call, Doctor Hosea repeated his opinion to Doctor Donald that AIDS can only be transmitted by blood transfusions, sharing of intravenous needles or sexual contact.

Doctor Donald and Nurse Hebyl contacted Doctor Charles Juels, the Director of Communicable Disease Control at Santa Barbara County Health Care Services. Doctor Juels was responsible for assessing infectious disease problems in Santa Barbara County and reducing the risk of transmission throughout the population. Doctor Juels wrote to Nurse Hebyl that: ". . . Contact of employees to an AIDS patient appears to pose no risk from all evidence accumulated to date."

Juels included in his letter an August 1983 bulletin from the United States Department of Health and Human Services entitled "Facts About AIDS" which contained the following information: "The failure to identify cases among thousands of friends, relatives and co-workers of AIDS patients provides further assurance that routine contact offers no risk. [¶] No cases have been found to date where AIDS have been transmitted by casual or even close daily contact with AIDS patients or persons in the high risk groups."

Doctor Juels again wrote Nurse Hebyl as follows: "AIDS is transmitted via very close personal contact, such as sexual activity, and through the use of blood products or sharing needles during illicit use of drugs. Casual social contact, as would occur in an occupational setting, poses no risk of transmission, according to all available data and the opinions of experts."

Doctor Juels visited the Raytheon plant in Goleta in order to gain a more complete understanding of Chadbourne's work environment and duties. After the tour, Doctor Juels met with Doctor Donald and Nurse Hebyl and advised them that there was no medical risk to the other employees at the plant if Chadbourne returned to work.

Nurse Hebyl, Doctor Donald and Stephen J. Alphas, Raytheon's medical director, made thorough studies of the communicability of AIDS. Besides the information they obtained from Doctor Hosea and Doctor Juels, they had telephone conversations with physicians at the Centers for Disease Control (CDC) in Atlanta, Georgia, the United States Government's public health facility engaged in collecting, evaluating and disseminating on a weekly basis data regarding AIDS and other diseases.

Nurse Hebyl was sent from CDC the Morbidity and Mortality Weekly Report (MMWR) of March 4, 1983, which included the following statement: "To date no person-to-person transmission has been identified other

than through intimate contact or blood transfusions." The doctor at CDC who sent this MMWR to Nurse Hebyl also told her on the telephone that CDC had not changed its position since the publication of the March 4, 1983, MMWR. He informed Nurse Hebyl that there was no proof that Chadbourne posed any threat to the people he worked with.

Doctor Donald wrote a confidential memorandum to Mr. Umanzio, Division Industrial Relations Manager at Raytheon. He informed Mr. Umanzio: "I agree that with the material evidence we have on hand, the report from the CDC, the discussion with Doctor Juels and upon physical examination, this individual [Chadbourne] can return to his job."

After conducting his own thorough investigation of the communicability of AIDS, Doctor Alphas agreed with Doctor Donald that Chadbourne "can return to his job." However, Doctor Alphas recommended that Chadbourne not be allowed to return to employment.

Mr. Umanzio consistently refused to make a final decision concerning Chadbourne's request for reinstatement to employment. In the words of Doctor Alphas, Raytheon's position should be to "beg for time."

Raytheon's refusal to reinstate Chadbourne to his employment continued until July 19, 1984. At that time Chadbourne developed Kaposi's sarcoma and had increased fatigue and weight loss due to radiation treatment and was unable physically to continue working. Raytheon's decision not to reinstate Chadbourne to employment was devastating and distressing to Chadbourne.

Raytheon's basis for denying Chadbourne reinstatement to his employment was that he had AIDS and that Chadbourne's coworkers might be at risk of contracting AIDS from him should he return to work.

Chadbourne filed two separate complaints seeking administrative relief alleging discrimination based upon a physical handicap. One complaint was filed with the California Department of Fair Employment and Housing and the other with the Office of Federal Contract Compliance Program (OFCCP) of the United States Department of Labor.

After receiving Chadbourne's complaint, the OFCCP made its investigation and, without holding a hearing, found that Raytheon, a government contractor, was subject to section 503 of the Rehabilitation Act of 1973. (29 U.S.C. § 793.) It also found that Chadbourne was handicapped within the meaning of the Rehabilitation Act, but it sustained Raytheon's position that

Chadbourne had not been discriminated against. It declined to award Chadbourne any relief.

Later, the California Fair Employment and Housing Commission (Commission) conducted a lengthy hearing with extensive briefing on the issues of employment discrimination as presented by Chadbourne's complaint. The Commission found that Raytheon had deprived Chadbourne of his fundamental civil right to be free of employment discrimination based upon a physical handicap. It awarded appropriate relief to the Estate of John Chadbourne, which had been substituted in as a party after Chadbourne's death.

Raytheon filed a petition for writ of mandate in the Santa Barbara County Superior Court. Judge Patrick McMahon issued an exhaustive and well-reasoned decision denying the petition for writ of mandate.

. . . . . . . . . . . . . . . . . . . . . . .*

Raytheon appeals the judgment denying the petition for writ of mandate. . . .*

Raytheon contends (1) AIDS is not a physical handicap under the Fair Employment and Housing Act, (2) the evidence does not support the Commission's findings that Raytheon violated the Fair Employment and Housing Act (FEHA), . . . * We are not persuaded by Raytheon's arguments and affirm the trial court's judgment in its entirety.

. . . . . . . . . . . . . . . . . . . . . . .*

The Commission found that AIDS is a "physical handicap" within the meaning of Government Code section 12926, subdivision (h). The Commission held: "Under this standard there can be no doubt that AIDS does constitute a physical handicap. It is plainly a physical condition of the body. And while AIDS did not impair Chadbourne's physical ability to do his job until long after he was first excluded from it [by Raytheon], there was not simply a possibility but a tragic certainty that the condition would at some time in the future seriously impair his physical ability and ultimately kill

---

* See footnote, *ante*, page 1242.

him. AIDS thus falls squarely within the physical handicap coverage of the Act."

■ The Commission's holding is in accord with the definition of "physical handicap" set forth by the California Supreme Court in *American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603 [186 Cal.Rptr. 345, 651 P.2d 1151].

In *American National Ins. Co.,* 32 Cal.3d 603, the issue was whether the physical condition of hypertension, commonly referred to as high blood pressure, was a physical handicap within the meaning of that section. For a condition to qualify as a physical handicap under the statute the court stated as follows: "Webster's tells us that a handicap is 'a disadvantage that makes achievement unusually difficult.' (Webster's New Internat. Dict. (3d ed. 1961) p. 1027.[Fn. Omitted.]) ■ Obviously a condition of the body which has that disabling effect is a physical handicap." The court made it clear that the condition did not have to be presently disabling in order to qualify as a physical handicap. (32 Cal.3d at pp. 609-610.) It concluded that high blood pressure was "physical" and often a handicap and therefore a physical handicap under section 12926 of subdivision (h).

HIV disease is a progressive immune system disease that is caused by the human immunodeficiency virus (HIV). HIV is a human retro-virus that affects essential white blood cells called T-4 helper lymphocytes, which play an essential part in the proper functioning of the human immune system. When all the interdependent parts of the immune system are functioning properly, a human being is able to fight off a variety of organisms, such as viruses, fungi, parasites and bacteria that are commonly present in our daily environment. The body is normally able to resist these organisms through a "strong, highly orchestrated" immune response. (See Redfield & Burke, *HIV Infection: The Clinical Picture* (1988) 259 Scientific American 90, 93 (hereafter *Redfield* ).) When the body's immune system becomes suppressed or debilitated, these organisms are able to flourish unimpeded.

HIV gains access to the human body only by certain specific routes. HIV enters the body through (1) sexual intercourse, (2) parenteral contact, that is invasive contact by infected blood, through, for example, sharing of contaminated intravenous needles or transfusion of blood or blood products, or (3) transplacental or perinatal contact, that is by an infected mother to child before or during birth or perhaps after birth through breast feeding. It cannot be transmitted through common daily contact. (Rep. U.S. Surgeon Gen. (1986) Acquired Immunodeficiency Syndrome, pp. 14-21.)

AIDS is the end stage of this gradual immune system deterioration. When the infected person's immune system becomes weakened and the

person suffers from any number of life-threatening opportunistic diseases or other conditions, the person is said to have developed AIDS. (See Centers for Disease Control Rev. of the CDC Surveillance Case Definition for Acquired Immunodeficiency Syndrome (1987) 36 MMWR 15, 35.) There is as yet no cure for the disease, and thus far it has been generally fatal. (See *Redfield, supra,* at p. 97.)

Because he had AIDS, Chadbourne incurred the opportunistic infections of pneumocystis carinii pneumonia and Kaposi's sarcoma. Chadbourne was eventually so crippled he could not even sit up and lost strength to the point where he could not move any part of his body. He had to be hospitalized.

Hospitalization can be evidence of physical handicap. In *School Bd. of Nassau County* v. *Arline* (1987) 480 U.S. 273, 281 [94 L.Ed.2d 307, 317, 107 S.Ct. 1123], the United States Supreme Court held that tuberculosis serious enough to require hospitalization establishes impairment.

■ AIDS is clearly a physical handicap within the meaning of Government Code section 12926, subdivision (h) as defined by the California Supreme Court in *American National Ins. Co.* Raytheon does not argue otherwise. It urges us adopt the dissent's much more restrictive definition of a handicap in *American National Ins. Co.* We have neither the authority nor the inclination to do so. The Commission and the trial court's conclusions that Chadbourne was physically handicapped as a result of AIDS must be sustained.

■ Raytheon argues that the evidence presented to the Commission does not support the Commission's finding of a violation of FEHA by it having refused to reinstate Chadbourne to employment. It suggests that in the early part of 1984 there was insufficient reliable information available that AIDS could not be transmitted in the workplace and its concern about protecting Chadbourne's coworkers at the plant from the virus was justified.

Code of Civil Procedure section 1094.5 provides, among other things, that when considering the validity of any final administrative decision, the court shall inquire into whether there was any prejudicial abuse of discretion. Such abuse of discretion would be established if the administrative decision is not supported by substantial evidence.

Raytheon challenges the Commission's factual finding of discrimination. ■ Our function in such a challenge is the same as the trial court, that is, to determine whether there is substantial evidence to support the finding. (*City and County of San Francisco* v. *Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976, 983-984 [236 Cal.Rptr. 716].)

We do not use the independent judgment test because the administrative decision does not involve any fundamental right of Raytheon. (*Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 395-396 [188 Cal.Rptr. 891, 657 P.2d 383].) ■ An employer's right to establish its employment practices and procedures and to impose conditions of employment is not a fundamental vested right. (*American National Ins. Co. v. Fair Employment & Housing Com., supra,* 32 Cal.3d at p. 607.) ■ "While the right to pursue a lawful business or occupation is a fundamental right [citations], there is no vested right to conduct a business free of reasonable governmental rules and regulations [citations]." (*Northern Inyo Hosp. v. Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 23 [112 Cal.Rptr. 872].) ■ The reviewing court must resolve reasonable doubt in favor of the administrative agency's findings. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12].) ■ Even were we to use the independent judgment test, we would come to the same conclusion reached by the Commission and the trial court.

Raytheon's assertion that much more is known now than was in 1984 about AIDS is not contested by counsel for Chadbourne nor in the amicus briefs. We disagree with Raytheon's suggestion that both the trial court and the Commisson based their decision on the many court decisions and the vast amount of medical research done since 1984 in finding and holding that AIDS cannot be transmitted by casual contact in the workplace.

The United States Supreme Court in *School Bd. of Nassau County v. Arline, supra,* 480 U.S. 273, directs that courts must look to existing, objective medical evidence when considering a decision detrimental to those handicapped by contagious diseases. In *Arline* the Supreme Court stated that a court inquiry should be " 'based on reasonable medical judgments given the state of medical knowledge, . . .'" and that "[i]n making these findings, courts normally should defer to the reasonable medical judgments of public health officials.' . . ." (*Id.,* at p. 288 [94 L.Ed.2d at p. 321].) This is exactly what the Commission did. It considered the evidence presented about how the virus is transmitted, the duration of the risk, the potential harm to third parties, and the probability of transmission under the circumstances of Chadbourne's employment.

All the considerable information collected by Raytheon in early 1984 from federal, state and local health agencies and various physicians, including the two employed by it, established that AIDS was not transmissible in the workplace and that Chadbourne could return to his job without risk to his fellow workers. Any other conclusion about the transmissibility of the HIV virus would have been pure speculation unsupported by any reason-

able medical judgment or knowledge. Raytheon's failure to reinstate Chadbourne to his job was based upon an irrational and unsupported belief he posed a risk to the health and safety of other workers. It was certainly not based upon any reasonable medical knowledge available in early 1984.

Government Code section 12940, subdivision (a)(1) prohibits an employer from discriminating against a handicapped person unless, among other things, the person ". . . is unable to perform his or her duties, or cannot perform such duties in a manner which would not endanger his or her health or safety or the health and safety of others." ■ The employer has the burden of proving the defense of the threat to the health and safety of other workers by a preponderance of the evidence. (*Sterling Transit Co.* v. *Fair Employment Practice Com.* (1981) 121 Cal.App.3d 791 [175 Cal.Rptr. 548].) ■ There was, in fact, no medical evidence to support Raytheon's defense of protecting the health and safety of others.

As the Commission so eloquently stated: "We are highly sensitive to the critical need to protect co-workers and others from contracting AIDS. And we are acutely aware that the devastating effects of this condition and widespread lack of knowledge about it have produced deep anxieties, and considerable hysteria, about the disease and those that suffer from it.

"But neither ignorance and fear nor the serious consequences of AIDS justify our departure from the carefully developed rules and procedures that govern our physical handicap cases. . . . Our task . . . is to determine carefully and objectively whether the evidence in the record before us demonstrates that there would in fact have been danger to Chadbourne's co-workers, under the standard stated above, had he returned to work.

"After the most thorough consideration, we are compelled by the overwhelming weight of the evidence to conclude that such danger would not have existed. . . .

"[T]he information [Raytheon] received was not, in fact, equivocal and stated uniformly that there would be no risk of infection of Chadbourne's co-workers through the kind of contact his job at Raytheon involved."

There was very substantial evidence to support the Commission's finding of discrimination and no evidence at all to support Raytheon's defense of protecting the health and safety of coworkers.

. . . . . . . . . . . . . . . . . . . . . .*

The judgment is affirmed.

Stone (S. J.), P. J., and Gilbert, J., concurred.

---

*See footnote, *ante*, page 1242.